**UNITED STATES of America,**
**Plaintiff–Appellee,**

v.

**Coy Ray PHELPS, Defendant–Appellant.**

**No. 89–10580.**

United States Court of Appeals,
Ninth Circuit.

Argued and Submitted Oct. 8, 1991.

Decided Feb. 4, 1992.

Janice M. Heid, Oakland, Cal., for defendant-appellant.

Joel R. Levin, Asst. U.S. Atty., San Francisco, Cal., for plaintiff-appellee.

Before PREGERSON, FERGUSON and O'SCANNLAIN, Circuit Judges.

PREGERSON, Circuit Judge:

Coy Ray Phelps, an insanity acquittee, appeals the judgment of the district court denying his release from the U.S. Medical Center for Federal Prisoners at Springfield, Missouri. We have jurisdiction under 28 U.S.C. § 1291. We affirm.

## BACKGROUND

On July 31, 1986, Coy Ray Phelps was found not guilty by reason of insanity on charges of possessing, manufacturing, and placing pipe bombs at five San Francisco locations.[1] Phelps was committed to the U.S. Medical Center for Federal Prisoners at Springfield, Missouri ("Springfield") pursuant to 18 U.S.C. § 4243(e).[2]

At his trial, Phelps called Dr. Fred Rosenthal, a psychiatrist, who testified that Phelps was a paranoid schizophrenic with a thirty-year history of mental illness. At the commitment hearing following acquittal, Dr. Rosenthal testified that Phelps was dangerous and should be confined in a treatment facility. Evidence produced at Phelps' commitment hearing included photographs of prominent people labeled with derogatory comments, instructions for building bombs and killing Jews and other minorities, lists of targets such as city hall, and various weapons.

Psychiatric Pre–Release Review Panels assessed Phelps on August 24, 1987 and March 7, 1988. On each occasion, the panel found that Phelps continued to suffer from a significant mental disease or defect and that release would pose a substantial threat of harm to others. Phelps was as-

---

1. Phelps was charged with violating 26 U.S.C. § 5861(f), 26 U.S.C. § 5861(d) and 18 U.S.C. § 844(f) and (i). The bombs were placed at the Black Studies Department of San Francisco State University, a synagogue, a synagogue school, the house of a rabbi, and the Humanist Party office.

2. 18 U.S.C. § 4243(e) provides in part:

If, after the hearing, the court fails to find by the standard specified in subsection (d) of this section that the person's release would not create a substantial risk of bodily injury to another person or serious damage of property of another due to a present mental disease or defect, the court shall commit the defendant to the custody of the Attorney General.

sessed a third time on April 17, 1989. The report of this panel, prepared by Dr. David Mrad, a psychologist at Springfield, concluded that Phelps' conditional release would no longer pose a threat to the community.[3] The Warden for the Springfield facility notified the court in a June 27, 1989 letter that, in the opinion of his staff, Phelps should be released. The government opposed Phelps' release and moved the court for a hearing pursuant to 18 U.S.C. § 4243(f).[4]

Before the hearing, the government moved the court for permission to have Phelps examined by its own psychiatrist and to call Phelps to testify at the hearing. Phelps objected to both motions, claiming violations of his privilege against self-incrimination and of section 4243(f). The district court granted both motions. To protect Phelps' privilege against self-incrimination, the court ruled that any statements Phelps would make would be deemed "compelled" and, thus, inadmissible in future criminal prosecutions. The court also ruled that Phelps had the burden of proof under 18 U.S.C. § 4243(f).

Phelps was evaluated by Dr. Park Dietz, a government-retained psychiatric expert on predicting dangerous behavior. Dr. Dietz found that the Springfield staff had not probed Phelps' racist/anti-semitic views which had prompted the bombings or his long-standing history of sexual abuse of children. Dr. Dietz concluded that Phelps continued to suffer from a mental disease or defect and that his release would create a substantial risk of bodily injury to others. His conclusions were based on a six-hour examination of Phelps, telephone interviews with Phelps' relatives, physical evidence, and a review of documents including police investigative reports, hospital records, previous psychiatric evaluations and Phelps' diary entries.

Dr. Dietz' conclusions conflicted with those of Dr. Mrad, who recommended release. Additionally, Dr. Mrad's conclusions about Phelps' behavior on the ward and in therapy sessions diverged dramatically from the progress notes made by other staff members. There were also discrepancies between statements in the Warden's letter recommending Phelps' release and testimony presented at the release hearing. The Warden's letter stated that Phelps could be released in Arizona where he had a daughter and former wife who were friendly and supportive. At the release hearing, however, Phelps' daughter and former wife testified that they had no interest in establishing or maintaining contact with him and that they would prefer that Phelps live elsewhere.

The district court found that Dr. Dietz' assessment of Phelps was "credible and convincing" while that of Dr. Mrad "lacked sufficient credibility." Accordingly, the district court denied Phelps' request for release. Phelps timely filed this appeal.

Phelps contends (1) that his Fifth Amendment privilege against self-incrimination was violated when he was ordered to submit to a psychiatric evaluation in anticipation of the release hearing and when he was called as a witness by the government at the hearing; (2) that his compelled submission to an examination by a government-retained psychiatrist violated both 18 U.S.C. § 4243(f) and his due process rights; and (3) that the district court erred by requiring him to prove that he no longer posed a substantial risk of danger to the community.

---

**3.** Phelps was examined again on May 28, 1991. This fourth Pre–Release Review Panel found that Phelps "continues to suffer from a significant mental disease which is causally connected to dangerousness." Letter from C.A. Turner, Warden U.S.M.C. at Springfield, to Judge Peckham (July 17, 1991) (discussing report of Pre–Release Panel).

**4.** 18 U.S.C. § 4243(f) provides that when the director of a facility in which an acquitted person is hospitalized under subsection (e) "determines that the person has recovered from his mental disease or defect to such an extent that his release ... would no longer create a substantial risk" of danger to the community, he shall file a certificate to that effect with the clerk of the court. Section 4243(f) further provides that the court shall order the discharge of the acquitted person or shall hold a hearing to determine whether he should be released.

## ANALYSIS

### I. Privilege Against Self–Incrimination

Phelps contends that his privilege against self-incrimination[5] was violated in two respects. First, Phelps argues that his Fifth Amendment privilege was violated because the release hearing was a "criminal" proceeding. Second, he contends that his privilege was violated because his statements during the psychiatric examination and at the hearing were used to prolong his confinement. Whether a district court can compel an insanity acquittee to submit to a psychiatric evaluation in anticipation of a release hearing or to testify at the hearing are questions of law reviewed de novo. *See Givens v. Housewright*, 786 F.2d 1378, 1380 (9th Cir.1986).

Phelps' claims fail on several grounds.

### A. *Compulsory Psychiatric Examination*

■ The United States Supreme Court's decision in *Allen v. Illinois*, 478 U.S. 364, 106 S.Ct. 2988, 92 L.Ed.2d 296 (1986), governs this issue. Under *Allen*, the ability of an insanity acquittee to effectively assert the privilege against self-incrimination to avoid participating in a psychiatric examination depends upon whether the proceeding is criminal or civil in nature. *Id.*

In *Allen*, the subject of commitment proceedings under the Illinois Sexually Dangerous Persons Act was ordered to submit to two psychiatric examinations. The trial court ruled that Allen's statements to the psychiatrists were not themselves admissible, but allowed each psychiatrist to render an opinion on Allen's mental condition based upon the interview with Allen. Allen's claim that his privilege against self-incrimination was violated was not based on the ground that his statements could be used against him in future criminal proceedings.[6] Rather, he claimed the right to

refuse to answer questions because the Sexually Dangerous Person proceeding, itself, was "criminal." *Id.* at 368, 106 S.Ct. at 2992–93.

The Illinois statute expressly provided that proceedings under the Act were "civil in nature." The Supreme Court did not accept this classification at face value. The Court observed that legislative labels were not dispositive of the issue. *Id.* at 369, 106 S.Ct. at 2992. Finding that the purpose of the Act was to provide treatment, not punishment, the Court held that the commitment proceedings were not criminal within the meaning of the privilege against self-incrimination. The Court noted that the Act was designed to provide care and treatment to effectuate recovery and that an acquittee could be released upon proof that he or she no longer posed a threat to the community. *Id.* at 369–70, 106 S.Ct. at 2992. Further, although the Illinois Act provided for criminal proceedings, criminal charges, criminal procedural safeguards, and commitment to maximum security prison, the Court did not find that these factors changed its basic "civil" nature. *Id.* at 369–72, 106 S.Ct. at 2992–94.

■ In Phelps' case, the district court followed the approach of the Supreme Court in *Allen*. It considered whether the release hearing under section 4243(f) more closely resembled a criminal prosecution or a civil commitment proceeding. The district court considered that the statute emphasizes treatment rather than punishment, that the acquittee bears the burden of proof, that the acquittee has no right to a jury determination, and that the acquittee can petition for release every six months. Accordingly, the district court correctly determined that the statute is "civil" in nature. Thus, it did not err in granting the government's motion to order Phelps to submit to a psychiatric examination.

---

**5.** The Fifth Amendment provides in part that no person "shall be compelled in any criminal case to be a witness against himself." U.S. Const. amend. V.

**6.** On review of Allen's case, the Illinois Supreme court held that "'a defendant's statements to a psychiatrist in a compulsory examination under

the provisions here involved may not be used against him in any subsequent criminal proceedings.'" *Allen v. Illinois*, 478 U.S. 364, 367–68, 106 S.Ct. 2988, 2992, 92 L.Ed.2d 296 (1986) (quoting *People v. Allen*, 107 Ill.2d 91, 104, 89 Ill.Dec. 847, 853, 481 N.E.2d 690, 696 (1985)).

As an additional reason for finding that Phelps' privilege against self-incrimination was not violated, we embrace the reasoning of the D.C. Circuit in *United States v. Byers*, 740 F.2d 1104 (D.C.Cir.) (en banc), *cert. denied*, 464 U.S. 1046, 104 S.Ct. 717, 79 L.Ed.2d 179 (1984). In *Byers*, the court addressed the issue of court-ordered psychiatric examinations in the context of proving insanity at the time of the offense. Byers did not claim that the testimony of the examining psychiatrist tended to incriminate him. Instead, he claimed that the government's evidence to negate his defense of insanity was acquired through compelled examination. In holding that a person who places his or her insanity at issue can be compelled to submit to psychiatric examinations, the court in *Byers* stated:

> When a defendant asserts the insanity defense and introduces supporting psychiatric testimony, his silence may deprive the State of the only effective means it has of controverting his proof on an issue that he interjected into the case. Accordingly, several Courts of Appeals have held that, under such circumstances, a defendant can be required to submit to a sanity examination conducted by the prosecution's psychiatrist.

*Byers*, 740 F.2d at 1110 (quoting *Estelle v. Smith*, 451 U.S. 454, 465, 101 S.Ct. 1866, 1874, 68 L.Ed.2d 359 (1981) (citations omitted)).

■ The same reasoning applies in the present case. An insanity acquittee places his insanity at issue by seeking release on the ground that he has recovered. Silence on the part of the acquittee deprives the government and the court of the only effective means of determining whether, in fact, he should be released.[7] Consequently, under such circumstances, an insanity acquittee can be compelled to undergo a psychiat-ric examination to determine fitness for release.

■ *Minnesota v. Murphy*, 465 U.S. 420, 104 S.Ct. 1136, 79 L.Ed.2d 409 (1984), provides additional support for our affirmance of the district court's order. In *Murphy*, the Supreme Court stated that a person may not claim the self-incrimination privilege merely because his answer to a question might result in revocation of his probationary status. *Id.* at 435, n. 7, 104 S.Ct. at 1146, n. 7. His answer, however, can not be used against him in a criminal prosecution. *Id. Cf. Middendorf v. Henry*, 425 U.S. 25, 37, 96 S.Ct. 1281, 1289, 47 L.Ed.2d 556 (1976) ("[F]act that a proceeding will result in loss of liberty does not ipso facto mean that the proceeding is a 'criminal prosecution' for purposes of the Sixth Amendment"). Similarly, Phelps' argument that it was error to allow his own statements to be used to prolong his confinement fails.

We have also held that other procedural safeguards of the criminal process do not apply in proceedings that involve determinations of sanity. In *United States v. Sahhar*, 917 F.2d 1197, 1205 (9th Cir.1990), *cert. denied*, — U.S. —, 111 S.Ct. 1591, 113 L.Ed.2d 655 (1991), we held that the right to a jury trial did not apply to a proceeding under an analogous provision, section 4246.[8] We find the rationale particularly appropriate here:

> [S]ection 4246 protects society by placing into the government's custody certain dangerous individuals. Section 4246 is not intended to address past wrongs, but rather to reduce the risk of future harm to persons and property. As soon as the committed individual can demonstrate that he is no longer dangerous, he is entitled to be released. Thus, federal commitment serves a regulatory, rather than punitive, purpose and section 4246

---

**7.** Of course, logic dictates that refusal to participate in release proceedings would only jeopardize the insanity acquittee's chance for release. Phelps contends that he cannot be compelled to participate in release procedures. He does so only because he believes that the burden of proof is on the court or the government to prove that he is still dangerous. (*See* Part III, *infra*.) Because we disagree with Phelps on the burden of proof issue, silence on his part does not aid his chance for release.

**8.** 18 U.S.C. § 4246 governs the commitment of dangerous persons found incompetent to stand trial.

need not incorporate the right to a jury trial.

*Sahhar,* 917 F.2d at 1205 (citations omitted).

We find no violation of the privilege against self-incrimination by requiring Phelps to submit to a psychiatric examination. Thus, we affirm the district court's order.

### B. *Compelled Hearing Testimony*

 We agree with the district court's determination that a release hearing is civil. Consequently, we need not reach the question whether a court may compel the subject of a criminal proceeding to testify.[9]

 The purpose of the release hearing, as well as of the psychiatric examination, is to determine the acquittee's present mental state; it is not to search for evidence of criminal activity. Any information gained from the psychiatric examination or from the hearing that bears on the acquittee's present mental condition, therefore, is not incriminating. Nevertheless, the district court took steps to protect Phelps' Fifth Amendment privilege against self-incrimination should his testimony incriminate him as to an offense other than the bombings for which he was tried.[10] To assure that his privilege was not violated, the court deemed Phelps' statements to be "compelled," thus granting Phelps use immunity in connection with any future criminal prosecutions that may be brought against him. *Cf. United States v. Westerdahl,* 945 F.2d 1083, 1087 (9th Cir.1991) (case remanded for evidentiary hearing where grant of use immunity to prosecution witnesses but not

to defense witness may have distorted fact-finding process); *United States v. Lord,* 711 F.2d 887, 892 (9th Cir.1983) (court may grant use immunity to defense witness where fact-finding process is intentionally distorted by prosecutorial misconduct). Through the district court's grant of immunity, the court is afforded a keener look into Phelps' present mental condition.

In light of the civil nature of the release hearing, the use immunity protections afforded Phelps by the district court, and the importance of determining Phelps' present mental condition, we hold that the district court did not err in ordering Phelps to testify at the release hearing.

### II. Psychiatric Examination

The provision governing release of insanity acquittees, section 4243(f), permits the court to hold a hearing to determine whether an acquittee should be released. However, it is silent on whether the court may order psychiatric evaluation. Phelps contends that the order of the district court, requiring him to submit to a psychiatric examination conducted by a government-retained psychiatrist, exceeds its authority under the statute and violates his right to due process of law.

### A. *Statutory Authority of Section 4243(f)*

 Whether 18 U.S.C. § 4243(f) permits the court to order a psychiatric evaluation is a question of statutory construction and is reviewed de novo. *United States v. Polizzi,* 801 F.2d 1543, 1547 (9th Cir.1986).

---

**9.** The determination whether a proceeding is criminal or civil takes on greater significance when a defendant or insanity acquittee is compelled to testify. In a civil proceeding, a person may be called to the stand without their consent. They may then assert the privilege against self-incrimination. *See Lefkowitz v. Turley,* 414 U.S. 70, 77, 94 S.Ct. 316, 321, 38 L.Ed.2d 274 (1973). In a criminal proceeding, the prosecution may not call a defendant to the stand absent his or her consent and may not comment on a defendant's refusal to testify. *See Griffin v. California,* 380 U.S. 609, 612–13, 85 S.Ct. 1229, 1232, 14 L.Ed.2d 106 (1965) (citing *Wilson v. United States,* 149 U.S. 60, 13 S.Ct. 765, 37 L.Ed. 650 (1893)). The question whether the subject

of involuntary civil commitment proceedings can assert the privilege against self-incrimination to avoid testifying was raised in *Tyars v. Finner,* 709 F.2d 1274 (9th Cir.1983). However, in *Tyars,* we declined to address this issue and instead decided the case on narrower grounds. *Id.* at 1283–84.

**10.** Phelps was also protected by the double jeopardy clause. U.S. Const. amend. V. He had been acquitted by reason of insanity for the San Francisco bombings and could not be prosecuted again for these offenses, even if he admitted planting the pipe bombs.

Phelps contends that the absence of express statutory authority indicates that Congress intended to curb the district court's power to order psychiatric evaluations for the purpose of release hearings.

Essentially, Phelps construes the statute in the following manner: He argues that the Warden's certificate recommending release under section 4243(f) represents a presumption that the recommendation is correct. The purpose of the hearing, Phelps suggests, is for the prosecution to cross-examine those persons who wrote the reports upon which the certificate for release is based. Thus, Phelps claims that the court and government may cross-examine the medical staff or retain their own experts to evaluate the evidence from Springfield, but they cannot require additional evaluations. Given this characterization, Phelps is of the opinion that the district court lacks the power to compel psychiatric examinations.

We cannot agree with this characterization of the statute. To accept Phelps' argument would be to unduly restrict the district court's ability to determine whether an insanity acquittee should be released. We have held that where express statutory authority is lacking, the district court may rely upon its inherent power to order a psychiatric examination. *See United States v. Malcolm*, 475 F.2d 420, 424 (9th Cir.1973) (district court's inherent power is source of authority for ordering psychiatric examination under 18 U.S.C. § 4244, providing for a determination of competency to stand trial); *United States v. Wade*, 489 F.2d 258, 258–59 (9th Cir.1973) (per curiam) (same). *Cf. United States v. Ives*, 574 F.2d 1002, 1004 (9th Cir.1978) ("Further inquiry is required whenever there is information available to the court which raises sufficient doubt regarding a defendant's competency to stand trial"), *cert. denied*, 445 U.S. 919, 100 S.Ct. 1283, 63 L.Ed.2d 605 (1980).

As the district court noted in the present case, the government's right to a hearing under section 4243(f) would have little value if the government were limited to cross-examining experts who had already concluded that Phelps should be released. Thus, if the Warden's certificate establishes a presumption that Phelps is fit for release, it must be a presumption that the government can rebut with additional evidence.

Phelps claims that the cases cited above are inapposite because they deal with sections of the statutory scheme not directly relevant to his situation. This claim lacks merit. Regardless of the type of proceeding,[11] the fact-finder must make a determination of the defendant's mental condition. Questions of mental illness and dangerousness turn "on the meaning of the facts which must be interpreted by expert psychiatrists and psychologists." *Addington v. Texas*, 441 U.S. 418, 429, 99 S.Ct. 1804, 1811, 60 L.Ed.2d 323 (1979). Thus, we hold that the district court has the authority to order psychiatric examinations to test the validity of the institution's recommendation.

### B. *Use of Government–Retained Psychiatrist*

Phelps claims that the use of Dr. Dietz' testimony deprived him of procedural due process. He contends that Dr. Dietz' assessment was biased because Dr. Dietz was retained by the government. Whether due process requires that the court appoint a "neutral" psychiatrist is a question of law to be reviewed de novo. *Givens v. Housewright*, 786 F.2d 1378, 1380 (9th Cir.1986).

This constitutional claim was not raised before the district court and, as a general matter, would not be entertained on appeal. However, where the issue is legal in nature and does not require factual determinations, it may properly be heard.

11. The Insanity Defense Reform Act of 1984, 18 U.S.C.A. §§ 4241–4247 (West 1985 & Supp. 1991), provides procedures for determining competency to stand trial, sanity at the time of the offense, commitment after acquittal by reason of insanity, and suitability for release, inter alia.

*United States v. Hayden,* 860 F.2d 1483, 1485 (9th Cir.1988). Because the constitutionality of using government-retained psychiatrists is a question of law, we choose to address it on appeal.

■■■■ A procedural due process analysis proceeds in two steps. First, a liberty or property interest must be involved. *Mathews v. Eldridge,* 424 U.S. 319, 332, 96 S.Ct. 893, 901, 47 L.Ed.2d 18 (1976). Civil commitment is a significant deprivation of liberty to which procedural due process protections apply. *Vitek v. Jones,* 445 U.S. 480, 491–92, 100 S.Ct. 1254, 1262–63, 63 L.Ed.2d 552 (1980).

The second step is to determine what process is due. *Mathews,* 424 U.S. at 333–34, 96 S.Ct. at 901–902. The determination of whether procedures satisfy due process is reached by balancing: (1) the private interest affected; (2) the risk of an erroneous deprivation of that interest and the probable value, if any, of additional or substitute procedural safeguards; and (3) the government's interest, including the function involved and the burdens that additional procedural requirements would place on the state. *Id.* at 335, 96 S.Ct. at 903.

■■■ One's interest in being free from confinement is substantial; the harm that Phelps would suffer from an erroneous determination is great. However, Phelps' interests were adequately protected by the procedures afforded at the hearing. Phelps had a copy of Dr. Dietz' report. He had a full and fair opportunity to cross-examine Dr. Dietz and to introduce his own evidence. *See* 18 U.S.C. § 4247(d). He could have requested that the court appoint an expert to evaluate him if he distrusted the government's expert, *see* Fed.R.Evid. 706, and he could have called Dr. Mrad to rebut Dr. Dietz' conclusions, *see* 18 U.S.C. § 4247(d).

The risk of an erroneous deprivation of Phelps' liberty interest was reduced by the amount of evidence considered by the district court. It considered the report of Dr. Mrad, recommending release, the report of Dr. Dietz, concluding that Phelps was still suffering from a mental disease or defect that rendered him dangerous, progress notes made by the Springfield staff, and testimony of Phelps and his relatives at the hearing. Additionally, Phelps demonstrated at his trial that mental illness caused his violent conduct, further reducing the risk of an erroneous determination. *See Jones v. United States,* 463 U.S. 354, 363–66, 103 S.Ct. 3043, 3048–50, 77 L.Ed.2d 694 (1983).

Phelps' interests must also be balanced against the strong governmental interest in preventing premature release of a person already proved to be violent and insane. For this reason, persons subject to commitment proceedings do not enjoy the same degree of rights attendant to a criminal proceeding. *Id.* at 367–68, 103 S.Ct. at 3051.

Thus, balancing the interests at stake and considering the purpose of the release hearing and procedural protections already afforded, we hold that Phelps' due process rights were not violated by the use of a government-retained psychiatrist to conduct the psychiatric evaluation of Phelps' mental condition.

### III. Burden of Proof

#### A. *Requirements of Section 4243(f)*

Phelps argues that the district court erred in construing the statute to require him to prove by clear and convincing evidence that he no longer posed a threat to the community. Allocation of the burden of proof pursuant to section 4243(f) is a question of statutory construction and is reviewed de novo. *United States v. Polizzi,* 801 F.2d 1543, 1547 (9th Cir.1986).

■■■ Section 4243(f) provides in part: "If, after the hearing, the court finds by the standard specified in subsection (d) that the person has recovered from his mental disease or defect to such an extent" that his release, or conditional release, "would no longer create a substantial risk of bodily injury to another person or serious damage

to property of another," the court shall order his release. 18 U.S.C. § 4243(f).

Section 4243(d) provides in turn: *"a person found not guilty only by reason of insanity* of an offense involving bodily injury to, or serious damage to the property of, another person, ... *has the burden of proving by clear and convincing evidence* that his release would not create a substantial risk of bodily injury to another person or serious damage to property of another due to a present mental disease or defect." 18 U.S.C.. § 4243(d) (emphasis added).

The text of the statute is crystal clear. The district court correctly allocated the burden of proof to Phelps.

Phelps claims, in addition, that the district court did not meet its burden of proving that he would continue to pose a danger to society if released. We have already stated that neither the district court nor the government has the burden of proof. In denying his release, the district court found that Phelps failed to meet his own burden. Accordingly, this claim must fail.

 Even were we to construe Phelps' contention as a claim that the district court erred in its fact-finding process, Phelps fares no better. Factual findings by the district court are reviewed for clear error. *United States v. Foreman,* 926 F.2d 792, 795 (9th Cir.1990). Here, the district court considered evidence from numerous sources in the process of ruling on Phelps' request for release. Serious discrepancies exist among the conclusions of Dr. Dietz, Dr. Mrad, Springfield staff professionals, and family members. Phelps presented no evidence on his own behalf other than the testimony and report of Dr. Mrad and the letter from the Warden of Springfield recommending release. Based on all the evidence, it cannot be said that the district court's findings of fact and denial of release were clearly erroneous.

### B. *Procedural Due Process*

 Phelps also argues, for the first time on appeal, that it is a violation of due process to shift the burden of proof to him.

We review this question of law de novo. *Givens v. Housewright,* 786 F.2d 1378, 1380 (9th Cir.1986). Although Phelps did not raise the issue with the district court, we may consider it. *United States v. Hayden,* 860 F.2d 1483, 1485 (9th Cir.1988).

This is a question of first impression for the Ninth Circuit, but we may look to other circuits for guidance. The Eighth Circuit, in *United States v. Wallace,* 845 F.2d 1471, 1474 (8th Cir.), *cert. denied,* 488 U.S. 845, 109 S.Ct. 121, 102 L.Ed.2d 94 (1988), held that placing the burden of proof on a defendant found not guilty only by reason of insanity and committed in accordance with section 4243 comports with due process. Applying the three factors from *Mathews,* the court found that deprivation of liberty was ameliorated by the countervailing factors of hospitalization and treatment. *Id.* Significantly, the court stated that when an insanity acquittee has already proved his mental illness by clear and convincing evidence at trial, it is constitutional to require proof by the same standard that he is no longer dangerous or insane. *Id.* at 1474–75. Similarly, the Eleventh Circuit held that placing the burden of proof on the insanity acquittee at a habeas proceeding did not violate due process. *Williams v. Wallis,* 734 F.2d 1434, 1440 (11th Cir. 1984). The state's interest in preventing the premature release of individuals who have already demonstrated their dangerousness to society by committing a criminal act outweighed the acquittee's interest in avoiding continued confinement. *Id.*

In the present case, a jury found beyond a reasonable doubt that Phelps committed violent acts. Phelps proved by clear and convincing evidence that these acts were the result of a mental disease or defect. *See* 18 U.S.C. § 17 (1988). It is not unreasonable, and therefore not unconstitutional, for Congress to have determined that an insanity acquittal supports an inference of continuing mental illness. *Jones v. United States,* 463 U.S. 354, 366, 103 S.Ct. 3043, 3050, 77 L.Ed.2d 694 (1983). Thus, we hold that the statute does not violate due

process by placing the burden of proof on an insanity acquittee in a release hearing.

## CONCLUSION

The judgment of the district court is AFFIRMED.